**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

2826 CLEVELAND AVENUE OPERATIONS, LLC,
D/B/A HERITAGE PARK REHABILITATION
AND HEALTHCARE,

      Petitioner,

v.

1199SEIU, UNITED HEALTHCARE WORKERS
EAST, FLORIDA REGION,

      Respondent.
_____/

## PETITION TO VACATE A LABOR ARBITRATION AWARD

Petitioner, 2826 Cleveland Avenue Operations, LLC, d/b/a Heritage Park Rehabilitation and Healthcare ("Petitioner" or "Heritage Park"), files this Petition to vacate a labor arbitration award pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and states:

### PARTIES, NATURE OF ACTION, AND JURISDICTION

1. This is a petition to vacate a labor arbitration award pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 and Fla. Stat. §682.13.

2. The U.S. District Court for the Middle District of Florida has jurisdiction over this petition to vacate pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

3. The U.S. District Court for the Middle District of Florida has personal jurisdiction over the Respondent because the location where the collective bargaining agreement governs the relationship between the Parties is in the Middle District of Florida, and many of the acts

1

complained of and giving rise to the claims alleged herein occurred in the Middle District of Florida.

4. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Respondent conducts substantial business in Fort Myers, and a substantial part of the events giving rise to the claims alleged herein occurred in this district, and pursuant to Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a).

5. Petitioner is a skilled nursing facility which is a Florida limited liability corporation and is an employer within the meaning of 29 U.S.C. § 152(2) of the National Labor Relations Act.

6. Respondent, 1199SEIU, United Healthcare Workers East, Florida Region ("Respondent" or "1199SEIU"), is a labor organization within the meaning of 29 U.S.C. § 152(5) of the National Labor Relations Act, representing employees in an industry affected by commerce.

**FACTUAL ALLEGATIONS**

7. Respondent was certified as the collective bargaining representative of certain of Petitioner's employees on May 23, 2016, by the National Labor Relations Board.

8. Respondent was certified as the collective bargaining representative of certain employees of Petitioner and certain employees of nineteen (19) other facilities' affiliated with Petitioner.

9. Prior to Respondent's certification, Petitioner's affiliated facilities had collective bargaining agreements with seventeen (17) of the other facilities, which expired on June 30, 2016.

10. Petitioner, three (3) of its affiliated facilities without prior collective bargaining agreements, and Respondent met in 2016 to begin negotiations over initial collective bargaining agreements. Additionally, at this time, Respondent began negotiating successor agreements to existing collective bargaining agreements with the seventeen (17) other facilities.

11. Those negotiations culminated in the Parties and the other affiliated facilities reaching a tentative agreement as to all twenty (20) facilities on or about May 19, 2016, four days before the Respondent was certified as the bargaining representative of employees of Petitioner. (See Tentative Agreement, attached as Exhibit "A").

12. The Tentative Agreement document contains only very specific terms and conditions of employment, and does not represent the entire bargaining agreement between the Parties.

13. The Tentative Agreement, except as noted, renewed and extended certain provisions of the existing collective bargaining agreements.

14. The Tentative Agreement specifically provided that only non-economic provisions of one of the existing bargaining agreements between the Parties shall apply to Petitioner and that Petitioner will "maintain the current facility policies for economic benefits which are not addressed by this Tentative Agreement."

15. The Parties continued to discuss changes to the final collective bargaining agreement after ratification of the Tentative Agreement.

16. On September 9, 2016, Respondent sent an email to Petitioner's representative noting that a draft bargaining agreement Petitioner previously provided omitted a certain "Side Letter #3," that was applicable to previous agreements between affiliates of Petitioner and Respondent. (See email from Ewart to Walker, dated September 9, 2016, attached as Exhibit "B"; see Letters of Understanding ("Side Letter #3") attached as Exhibit "C").

17. At that time, Petitioner expressed to Respondent in a responsive email dated September 12, 2016, that Petitioner believed the Side Letter #3 to have expired at the end of the term of the prior agreements, and therefore, was not part of any current agreement between the parties. (See email from McWilliams to Ewart dated September 12, 2016, attached as Exhibit "D").

18. When Respondent made it clear there was a disagreement as to the inclusion of the Side Letter #3, Petitioner explained to Respondent that there was no meeting of the minds with respect to the existence of a bargaining agreement between Petitioner and Respondent. (See emails between McWilliams and Ewart dated September 12, 2016, attached as Exhibit "D").

19. On October 27, 2016, in an effort to finalize and ratify a final collective bargaining agreement between the Parties, the Petitioner signed what it believed to be the final collective bargaining agreement, without the Side Letter #3. (See collective bargaining agreement, attached as Exhibit "E").

20. On November 14, 2016, the Respondent signed the proposed final collective bargaining agreement from Petitioner ("CBA").

21. Even after signing the CBA with Petitioner, without the Side Letter #3, the Respondent continued to insist that the Side Letter was part of the Parties' new collective bargaining agreements with all twenty (20) facilities.

22. The Respondent did not agree that the Side Letter #3 was excluded from the collective bargaining agreements between the Parties until on or about January 12, 2017. (See email from Gornail to McWilliams, dated January 12, 2017, attached as Exhibit "F").

23. On or about September 1, 2020, Respondent filed of a grievance for wage equality stemming from the hiring of two (2) CNAs by Petitioner on October 4, 2016, which was before the Parties signed the CBA. (See email grievance specifics, dated September 3, 2020, attached as Exhibit "G").

24. Despite the fact that, as of October 4, 2016, the parties had not signed the CBA and, therefore, did not have a document with terms to govern the parties actions, and still disagreed about the inclusion of Side Letter #3, Respondent's grievance asserted that Petitioner's hiring of

4

two (2) new CNAs on this date, at a rate that was more than the current CNAs were receiving, was in violation of certain provisions of the CBA that stated that any new employee could only be hired at a rate at least $.20 per hour less than the wage rate of any existing employee with comparable experience and education.

25. The "pay equity" issue at the center of Respondent's grievance is an economic benefit that was not covered by the Tentative Agreement and, pursuant to the Tentative Agreement language, the Petitioner's policies at the time would control.

26. There was, therefore, no collective bargaining agreement with provisions related to wage equity in place between the Parties at the time the new CNAs were hired by Petitioner.

27. The Petitioner and Respondent disagree on the interpretation of when the CBA was formed, signed, and ratified.

28. Upon the realization that the date of the alleged grievance was prior to the Parties signing and ratifying the CBA, the Petitioner notified both the Respondent and the arbitrator selected to hear the grievance that the issue raised by the Respondent's grievance was not substantively arbitrable, and that the arbitrator lacked the authority and jurisdiction to hear the grievance until the contract formation issue was decided by the Courts.

29. The arbitrator refused to stay the arbitration proceeding pending resolution of the contract formation issue before the Courts. (See email from arbitrator, dated March 13, 2021, attached as Exhibit "H").

30. A hearing on the Respondent's grievance was held on March 24, 2021. At that time, Petitioner again advised the arbitrator that he did not have the authority to rule on the substantive arbitrability issue. The arbitrator disagreed and moved forward with the hearing without Petitioner's participation.

31. On May 10, 2021, the arbitrator issued his award in favor of Respondent. (See arbitrator's award, dated May 10, 2021, attached as Exhibit "I").

32. In the arbitrator's award, "the arbitrator made a decision on the argument of substantive arbitrability." (See Exhibit "I", p. 5).

33. While the arbitrator noted that the Parties' "agreement was dated May 28, 2016," (See Exhibit "I", p. 6), the actual agreement was not signed by the representative for the Petitioner until October 27, 2016, and was not signed by the representative for the Respondent until November 14, 2016. (See Exhibit "E").

34. The arbitrator then erred by noting in his decision that, "[i]t is immaterial to this grievance that the Union and the Employer may have been engaged or may be engaged in discussions and **<u>negotiations after May 28, 2016</u>**." (See Exhibit "I", p. 6) (emphasis added).

## COUNT I

### ORDER VACATING THE ARBITRATOR'S AWARD

35. Petitioner reincorporates and realleges Paragraphs 1 through 34 of the Petition as though fully set forth herein.

36. Petitioner is entitled to this Court's order vacating the Award, because the Award does not draw its essence from the CBA and usurps the role of the Court in determining whether the dispute is one the parties to the CBA agreed to submit to arbitration, as well as when the contract between the Parties was formed. The Award is irrational, disregarded the unambiguous, plain language of the CBA, dispenses the arbitrator's own brand of industrial justice, and exceeded the arbitrator's jurisdiction.

## **PRAYER FOR RELIEF**

WHEREFORE, the Petitioner prays for judgment as follows:

a. That judgement be entered in Petitioner's favor;

b. That an Order issue from this Court vacating the Award;

c. For the Petitioner's costs of suit herein;

d. For the Petitioner's attorneys' fees herein; and

e. For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Petitioner hereby demands a jury trial on all issues so triable.

Dated: August 6, 2021

/s/ Jennie L. Conrad
Laura C. Datz
Florida Bar No.: 91386
Laura.C.Datz@consulatehc.com
Jennie L. Conrad
Florida Bar No.: 92314
Jennie.L.Conrad@consulatehc.com
Office of Corporate Counsel
Consulate Health Care
5102 West Laurel Street, Suite 700
Tampa, Florida 33607
Telephone: (813) 769-6280
Facsimile: (813) 769-6281
Attorneys for Petitioner

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via CM/ECF, which will send an electronic notice of filing, on this 6th day of August 2021, to the following:

Patricia Ireland
Holly Oliva-Van Horsten
Phillips, Richard & Rind, P.A.
9360 SW 72nd Street
Suite 283
Miami, Florida 33173
pireland@phillipsrichard.com
holly@phillipsrichard.com

                Respectfully submitted,

                /s/ Jennie L. Conrad
                Laura C. Datz
                Florida Bar No.: 91386
                Laura.C.Datz@consulatehc.com
                Jennie L. Conrad
                Florida Bar No.: 92314
                Jennie.L.Conrad@consulatehc.com
                Office of Corporate Counsel
                Consulate Health Care
                5102 West Laurel Street, Suite 700
                Tampa, Florida 33607
                Telephone: (813) 769-6280
                Facsimile: (813) 769-6281
                Attorneys for Petitioner